My name is Phyllis Matey, and I'm the attorney for Todd Thelen. And I was just thinking, after watching the other court cases, that I've outlined everything in the briefs, and I've got my presenting argument that I could present here, but what things about this case are of interest to you and questions that I could answer? If you don't have any, then I'll just proceed. Well, my only question is about your argument concerning the credibility aspect of the case. You seem to argue that because the administrative law judge didn't precisely describe the daily activities, that somehow they were being misunderstood or mischaracterized, and that the daily activities were not a proper basis to disbelieve the extent of the testimony. I'm paraphrasing there, but I had some difficulty with that argument, because it seemed to me that in general, an administrative law judge can summarize things, and there was nothing on that list that in fact your client can't do at all. It's not as if they said, well, he's a mountain climber, and he's testified, I hate mountains. I'm scared of heights. I never go there. So it's much more subtle than that. And I wonder if you would talk about why that's insufficient in your view. Yeah. I'd say what was indicative is the bias that this judge had in interpreting this unrepresented claimant. Remember, this is an unrepresented claimant. Where the claimant said, I count pitches in baseball games. I have, you know, he had been coaching for five years. He's had five kids. All the years before he had this accident, he was a carpenter and he had an accident. So this is something he had an injury, he was taken by ambulance to the hospital, and everything else is in the record. So what he said to the judge was, I go to the baseball field when I can, and I count pitches. Well, if anybody knows about coaching baseball, you sit there and literally they can only pitch so many pitches. Saying that's not quite like being on third base and waving the runner on. He says, I can't do anything physical. I just count pitches. He really isn't even coaching, but he sank himself in a sense by saying it was coaching. But that is so often with my clients who are very physical, they've been carpenters, doing coaching baseball, for them to be able, it's something to do with their self-esteem, especially if they're depressed, that they say, okay, I'm coaching baseball. But in fact, he was just counting pitches. He says he can't do anything physical. And that is indicative of everything the way this judge had treated this claimant throughout the whole time. He even, I've gone through in my reply brief, going through the different mischaracterizations of the ADLs that the U.S. Attorney's Office attorney has cited. And my client, he has said over and over, he has trouble sometimes taking showers. He has trouble tying his shoes. The judge, when he said, can you carry a 20-pound bag, and my client said, well, how heavy is that? And the judge said to him in the testimony, oh, it's not that heavy. So the client said, well, if it's not that heavy, yeah, I can carry it if it is from the waist level. And another time during the testimony, he asked the client, what is the pain – what is your pain like? And the client basically said his pain, it was a lot of pain. It felt like his – excuse me, but he said it felt like his butt is going up his back, and it just is really, really very painful. And the judge said something, I'm paraphrasing, said, well, I guess I'll say it's not so bad. And the client says, no, I'm telling you, my pain is a lot. So basically, the thing about coaching baseball, I think, is indicative throughout the whole ADLs and the way they've been interpreted. Is there any other question? One of the things in this case that I find very amazing, and I also would like to point out right here, is the fact that two pieces of evidence that were very important in this case, one Dr. Levinson and one Dr. Virab. Dr. Levinson did a full psychological evaluation of this claimant on referral from Kent Field Pain Management Center. So it didn't make their way to the record. It didn't make their way. The appeals counsel found it. The appeals counsel said these two pieces of records were in the file, they weren't exhibited. Both of these evidence, the Levinson report did a whole Beck depression inventory which found him severely depressed, found him to have anxiety. They did the MMPI-1, MMPI-2. And those pieces of evidence could have affected the credibility issue, too, correct? Exactly. And that evidence of Levinson actually supported Social Security's own consultative evaluator, which is Dr. Olick, who the ALJ discounted, and Dr. Olick said the client had a major depression. He gave him the diagnosis 296.33. In order to have the fifth digit 3, it has to be a severe depression. Now, that also That's AULUK, Olick? Yeah, AULUK. I just want to make sure I'm tracking. Yep. Olick is 16-307. Levinson is 12-363 in the transcript. So this also dovetails with the vocational argument, vocational witness argument, in that the vocational witness, when the hypothetical was given, if the claimant had a moderate impairment in concentration, the vocational expert testimony was this person is totally disabled. He can't do any job. It was already decided he can't do his regular job. Alternative job, no, he can't do the alternative job. But the ALJ said, I'm going to decide that the claimant only has mild difficulties with concentration. Remember, he didn't the Levinson-Beck inventory that said severe depression was somewhere scattered in the file and not before him exhibited. So just that, based on a simple argument, based on the V.E., it should be a complete reversal based on Lester. It's totally on point with Lester. Lester is a case law that says based on a matter of law, if the facts are there on V.E., it doesn't have to be a remand. It can be reversal. Let's see. What are the other aspects related to? Once again, it relates to the due diligence of an ALJ. The ALJ only had to, with an unrepresented claimant, it's heightened with an unrepresented claimant. It's heightened with insufficient evidence. If there's somewhere in the record that says there's insufficient evidence under Smolin and I can't read my other site, I think it's Armstrong, then there's a heightened level for inquiry, too. So we have the heightened level of the unrepresented claimant, heightened level for, I have my time here, for insufficient evidence, and the ALJ's own file under the State Agency Evaluation DEA, they said the person wasn't, Phelan wasn't disabled based on insufficient evidence. That's site 19-329. So there we have a couple of different things. And the heightened inquiry for due diligence with the ALJ, he only had to go into his file and look at the two pieces of very important evidence there. Let me ask you a couple of questions about this lifting situation. The ALJ says, moreover, the treating neurosurgeon concluded, the treating neurosurgeon concluded that claimant could not lift over 10 pounds or bend repetitively, citing Exhibit 7-F. And then the ALJ comes out of what seems to me to be nowhere, and I'll telegraph this to the other side, and says, nonetheless, claimant testified he can lift 20 pounds from the table and bend over. And that seems to be a mischaracterization of what he said. Exactly what was his testimony, again, about lifting 20 pounds? That's the one that I said when the ALJ said, can you lift 20 pounds? And the ---- What page of the transcript did that go? When I come back, I'll ---- 5455. 54? Yeah. He said, well, how heavy is that? And the ALJ said, it isn't that much. It isn't that much. And he said, okay. Where he should have said ---- Roughly two grocery bags. Two grocery bags. And but what ---- how big is the grocery bag? Normally, the ---- Is it full of parsley or is it full of milk? Normally, the question is, are you able to carry two 1-gallon jugs of milk in either hand? That's normally the type of question if the claimant was represented, because then a person can relate to that. Okay. Can you ---- that were ---- turns into maybe 17 pounds, like 8 1⁄2 pounds per hand. The ALJ seems to make it sound like if you just read this, oh, he can lift 20 pounds, even though the neurosurgeon says he can't. He can't. And the only other person that said anything that he relies on is Dr. Wheeler, who is the CE evaluator. And he didn't have any records except an MRI report and an X-ray report. He didn't have the EMG. He didn't have any of the doctor's reports. Dr. Wheeler, after saying he has a chronic pain syndrome, after saying, oh, they all agreed, even Dr. Wheeler, that he had neuropathy and radiculopathy, and they weren't sure what it was coming from. Dr. Wheeler came and said he could do heavy work. He said he could lift 40 pounds occasionally, which Social Security defines occasionally as 2 1⁄2 hours out of an 8-hour day, and that he could lift 20 pounds frequently, which is 5 1⁄2 hours out of an 8-hour day. Let me read you another sentence. The claimant testified to playing video games, throwing the ball around, and coaching a baseball team. You say that overstates the situation? Definitely. What did he say about throwing the ball around? I mean, this makes it sound like he's throwing the ball around with a baseball team. I think I would have to look at the transcript to see exactly. As I said, I didn't represent him. When looking through the whole thing, I think he said something like, well, once in a while, I try to go out. He's got five kids, and I try to throw something. You know, he has five children. Yeah. What precisely are you asking us to do? I'm asking you to, there's enough facts in this case to just completely reverse this case. He, and, um, As compared to sending it back for a Yeah, not to send it back. There's no reason. If you just look at the vocational evaluation with I, my concern about that is that there, there are at least two pieces of evidence that the ALJ never looked at at all. And normally, when there's evidence that was improperly overlooked or a wrong standard that was used, we normally let the agency take the first look at the correct record or the correct legal standard. And so it's a little bit different than the usual case in that regard. That's why I brought it up, in that I feel it's the same as Lester. Lester had, was a vocational evaluator. And it's basically, you could say, all right, looking at Levinson, which, you know, just supports it, that Olook, which is their own social security consultative evaluator, that he said this person had a major depression. If you look at Olook's ADLs, where he says, okay, look at the function See, I guess my problem isn't that that isn't a good argument. It's just that we are not supposed to be making decisions in the first instance about evidence. We're supposed to be reviewing what other people have done with evidence. And one of the problems in this case is that there was evidence that should have been included in the record and was erroneously omitted. And I'm uncomfortable saying, well, let's just go ahead and look at that de novo and put that into the mix. Obviously, my discomfort is mine alone. And just speaking for myself, my concern about saying, oh, well, we'll just reverse and require the payment of benefits, when to do that, at least in part, we'd be relying on things that were never looked at by the original factfinder. Alito, were there cross motions for summary judgment on this one? At least that's what I always get in mind, or not. I believe there were cross motions. Yes. Yeah, there has been. Another way, of course, would be to undo the negative credibility finding and remand it for new consideration, including the information that apparently wasn't valuable. Yeah. I'm as you know, since I'm his attorney, I'm looking for whatever way. I mean, to use the baseball analogy, like throw Levinson and Varave out of this courtroom, the other evidence that was missing. And just based on the record itself, based on OLOK and based on all of Leverson's, I think there is enough based on the objective medical evidence. We used to try that in immigration cases, but the Supreme Court came right down on our head with a nine-fold hammer. So I know my time is over. I'm trying to just think of one of the other thing is, is he's had so much stuff going on, it's been so long, I know he's, they hardly have any money, and that's why I'm thinking. If it's not in the record, we can't consider it. I'm saying I think it is in the record. And every time you look at something with him, he was supposed to get psychotherapy, the workers' compensation discontinued it. He's been requesting surgery, workers' compensation insurance company denied it. That's all in the record. So do whatever you can, but thank you. Thank you, counsel. We'll hear from Mr. Roth. Good morning, Your Honors. Armand Roth for the Commissioner of Social Security. I'm going to try to address the point that was raised. Could you raise the microphone so we can hear you a little? Yes. Thank you. Starting first with the evidence that was allegedly not considered, I would like to point out first that the appeals counsel took into account that evidence and said that it wasn't a basis, it wasn't material, and it wouldn't change the result. Let me address the point. How is that possible when it seems intimately bound up with the claimant's credibility? The more medical records support his testimony, the more likely it is that a judge would find him to be credible. I see that all as kind of a piece. I don't understand how it could be harmless or irrelevant. If I address first the psychologist evaluation, you have a psychologist evaluation in July of 2001, in one month's period, as a preliminary to send this person to a pain management program. After that, you don't have any other treatment. And later on, she will provide a letter saying that she hasn't seen that person for a long time. Now, if you look in between that psychologist evaluation and Dr. Olex, the constructive psychiatric evaluation, you don't have any, you don't have treatment, psychiatric treatment. What you have, this person goes through treatment for his back, and you have a number of examinations during which his mental status is found to be normal. He's alert and oriented, mental status is normal. So, the only, there was no evidence later on that was provided on the psychological level that this person had a mental deficit more than mild. I would like to point out also that if you look carefully at the record, you know, this person at some point went to vocational rehabilitation school, and he explained when called by a disability examiner at the request of Dr. Matthews, who realized that this person had activities much more significant than Dr. Olex was aware of. He explained, I didn't work after vocational rehabilitation because of my back, not because of psychological problem. So, in the sense of that, for the medical evidence and the evidence of any mental impairment more than mild, there is no evidence that was submitted to the appeals council that would indicate otherwise. With regard to his credibility in particular, with regard to the, let me go back first to the medical and address the 10-pound issue before going to the subjective. It's true that Dr. Libousson, Dr. Libousson found that at some point he could only carry 10 pounds, but it's the same doctor who released him to vocational rehabilitation to go to building inspector school. It's true that if you look at the DOT, a building inspector is light work. So, it's more than 10 pounds, and it's possible, quite possible, that this person couldn't work, couldn't be a building inspector, had a problem with his back. But the ALJ says, well, he could lift 20 pounds. And if you look at the testimony, that really seems to be a mischaracterization of what was happening in that testimony. Well, in this testimony, he said 20 pounds. If you interpret it otherwise, what I would suggest is looking at the VE. What the VE tells you is, based on an RFC, that really is an RFC which is an RFC for sedentary, even though it includes a 20 pounds. If you look at his testimony, I mean, if you say, okay, well, we're substituting two bags of groceries for 20 pounds. I mean, that doesn't mean 20 pounds anymore. It means two bags of groceries. You get into an amorphous concept. Who knows how much two bags of groceries weigh? And he says, well, I can lift those if they're at table height, but I can't bend over, and it just seems that this follows in with the coaching stuff. I mean, when you read what the ALJ says, he's coaching baseball. And you read what the transcript says, and he's counting pitches. And it seems to be, even though he used the word coaching, it seems that we've entered the spin zone, to use something from a rather unappetizing television news program. I mean, you read the underlying information, and you read what the ALJ says about it. It's like, wait a minute. He was counting pitches. Why? Because he couldn't coach anymore. He couldn't coach anymore, so he was counting pitches. And he really didn't say he could lift 20 pounds the way the ALJ says he could lift 20 pounds and bend over. He didn't really say he could bend over. And all the other things the ALJ describes, when you read what he says about him and you read the transcripts, they're all qualified. And the ALJ makes it look like it looks like a completely different person. First, with the 10 pounds, Your Honor, there is a one-time evaluation by Dr. Libouson at that point. Yeah, but did he testify, I can lift 20 pounds? Well, he testified 20 pounds. There is some ambiguity there, you could say. There's a lot of ambiguity there. That's true. There is some ambiguity. But nonetheless, this person was found to be, you know, if you look at the VA testimony, the VA testimony is based on sedentary. There are two jobs in particular that are cited that are sedentary jobs. Did he really testify he was coaching baseball? Let me go back to the baseball then, because I think the VA takes care of your 10 pound issue if you look at it. But what about coaching? About coaching, you know, there is different interpretation that are possible. You know, Counsel, I'm often unkind in talking about ALJs as playing doctor. And this one is so relevant of that throughout the questions that my colleagues have pointed out. I think it's very difficult. And maybe you ought to recede in terms of saying, well, even if those things are true, then something else. But to do battle on those grounds is really a losing struggle, I would suggest. I would just find one signal on that, Your Honor. I just would like to point out that actually he was said that he could throw a ball, for instance. He could play catch with his children, which involves a certain level of activity that may not be light, maybe, but is consistent with sedentary. He went through vocational school, which involves, I assume, as a building inspector, I don't think there was any practical part, but it does involve. And he failed, didn't he? Well, he didn't pass. He didn't pass, but it's a light work. It's a light work level. See, but there you go again. I mean, he went to school. He failed. I mean, it just, it takes the gloss right off of it when you look behind the scenes. If you look at his testimony, he's asked, are you able to demonstrate, do things in baseball to the kids? He says, not too well, no. He doesn't say, it's not an unqualified, no. He says, not too well. He's not a paraplegic, but let's deal with the realities, counsel. Yes. Well, the reality is that this person has a back problem. So a lot of the activities are sliding. And, you know, I'm not familiar with baseball. But it's a very high level, I assume, of activity. He does more than pitching, I assume, from what he's saying, because he can catch ball, he can play catch with his – he can throw ball, play catch with his children. How old are his kids? Well, age 4 to 11, they're pretty young, Your Honor. I was playing catch with my 4-year-old grandson the other day, and I was a foot away from him, going like that. Well, I don't know if your grandson weighs 10 pounds or 20 pounds, Your Honor, and if that's an issue. But this person, essentially, the limitations, even with regard to the coaching base – coaching baseball, are not inconsistent with an RFC, which is essentially an RFC for sedentary work. And you have the V testimony that tells you that there are jobs in the DOT that exist in significant numbers that are at the sedentary level. And in the end, with regard to his limitations, if you have evidence in both directions, normally the ALJ's findings should be affirmed. And I understand that there is a possible over-interpretation of the evidence. I'm not saying that this is the only interpretation. And also, if I can add one thing, it's also interesting, if you look at this case, that all along, there are various descriptions of what this person can do. If you look at the ADLs, as described by Dr. Olark in February 2003, for instance, you look one month before, his description of his ADLs to the physical examiner is entirely different. It's much broader. So in terms of a part of what this person does, I think the ALJ was also aware that there were inconsistencies in this testimony. Maybe this person sometimes thinks that he cannot do as much as he can actually do. I do not know if that is the case. But there are some inconsistencies in the way he describes his activities. And I think this is also relevant to this case, Your Honors. And for those reasons, I submit that the ALJ's decision should be affirmed, Your Honors. Thank you, counsel. The case just argued is submitted. You did use considerably more than your share earlier. So we thank both counsel for your arguments. And our final case on this morning's docket is Kinslow v. Calvert Insurance.
judges: Trott, Graber, Shadur